# EXHIBIT E

HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

Get Home Delivery | Welcome, mhof1218 | Member Center | Log Out

The New York Times

**Washington**

U.S.  All NYT  Search

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

POLITICS  WASHINGTON  EDUCATION



# Bush Signs Law to Widen Reach for Wiretapping

By JAMES RISEN
Published: August 6, 2007

E-MAIL
PRINT
REPRINTS
SAVE
SHARE



WASHINGTON, Aug. 5 — President Bush signed into law on Sunday legislation that broadly expanded the government's authority to eavesdrop on the international telephone calls and e-mail messages of American citizens without warrants.

**Related**

Blogtalk: Debating the FISA Bill

Congressional aides and others familiar with the details of the law said that its impact went far beyond the small fixes that administration officials had said were needed to gather information about foreign terrorists. They said seemingly subtle changes in legislative language would sharply alter the legal limits on the government's ability to monitor millions of phone calls and e-mail messages going in and out of the United States.

They also said that the new law for the first time provided a legal framework for much of the surveillance without warrants that was being conducted in secret by the National Security Agency and outside the Foreign Intelligence Surveillance Act, the 1978 law that is supposed to regulate the way the government can listen to the private communications of American citizens.

"This more or less legalizes the N.S.A. program," said Kate Martin, director of the Center for National Security Studies in Washington, who has studied the new legislation.

Previously, the government needed search warrants approved by a special intelligence court to eavesdrop on telephone conversations, e-mail messages and other electronic communications between individuals inside the United States and people overseas, if the government conducted the surveillance inside the United States.

Today, most international telephone conversations to and from the United States are conducted over fiber-optic cables, and the most efficient way for the government to eavesdrop on them is to latch on to giant telecommunications switches located in the United States.

By changing the legal definition of what is considered "electronic surveillance," the new law allows the government to eavesdrop on those conversations without warrants — latching on to those giant switches — as long as the target of the government's surveillance is "reasonably believed" to be overseas.

For example, if a person in Indianapolis calls someone in London, the National Security Agency can eavesdrop on that conversation without a warrant, as long as the N.S.A.'s target is the person in London.

Tony Fratto, a White House spokesman, said Sunday in an interview that the new law went beyond fixing the foreign-to-foreign problem, potentially allowing the government to listen to Americans calling overseas.

But he stressed that the objective of the new law is to give the government greater flexibility in

**More Articles in Washington »**

@Times - Inside NYTimes.com by E-Mail

Sign up for regular updates on what's new on NYTimes.com.
See Sample
mchofman@hotmail.com   Sign Up
Change E-mail Address | Privacy Policy

**MOST POPULAR**

E-MAILED | BLOGGED | SEARCHED

1. David Brooks: The Outsourced Brain
2. The Migraine Diet
3. Five Easy Ways to Go Organic
4. State of the Art: Apple Offers New Goodies in Leopard System
5. Well: Shhh...My Child Is Sleeping (in My Bed, Um, With Me)
6. Saudi King Tries to Grow Modern Ideas in Desert
7. James Watson Retires After Racial Remarks
8. A Celebration of Tex-Mex, Without Apology
9. Drug-Resistant Staph: What You Need to Know
10. Paul Krugman: A Catastrophe Foretold

Go to Complete List »



The New York Times OPINION
nytimes.com/opinion



Who's rooting against the Red Sox?

focusing on foreign suspects overseas, not to go after Americans.

"It's foreign, that's the point," Mr. Fratto said. "What you want to make sure is that you are getting the foreign target."

The legislation to change the surveillance act was rushed through both the House and Senate in the last days before the August recess began.

The White House's push for the change was driven in part by a still-classified ruling earlier this year by the special intelligence court, which said the government needed to seek court-approved warrants to monitor those international calls going through American switches.

The new law, which is intended as a stopgap and expires in six months, also represents a power shift in terms of the oversight and regulation of government surveillance.

The new law gives the attorney general and the director of national intelligence the power to approve the international surveillance, rather than the special intelligence court. The court's only role will be to review and approve the procedures used by the government in the surveillance after it has been conducted. It will not scrutinize the cases of the individuals being monitored.

The law also gave the administration greater power to force telecommunications companies to cooperate with such spying operations. The companies can now be compelled to cooperate by orders from the attorney general and the director of national intelligence.

Democratic Congressional aides said Sunday that some telecommunications company officials had told Congressional leaders that they were unhappy with that provision in the bill and might challenge the new law in court. The aides said the telecommunications companies had told lawmakers that they would rather have a court-approved warrant ordering them to comply.

In fact, pressure from the telecommunications companies on the Bush administration has apparently played a major hidden role in the political battle over the surveillance issue over the past few months.

In January, the administration placed the N.S.A.'s warrantless wiretapping program under the Foreign Intelligence Surveillance Act, and subjected it for the first time to the scrutiny of the FISA court.

Democratic Congressional aides said Sunday that they believed that pressure from major telecommunications companies on the White House was a major factor in persuading the Bush administration to do that. Those companies were facing major lawsuits for having secretly cooperated with the warrantless wiretapping program, and now wanted greater legal protections before cooperating further.

But the change suddenly swamped the court with an enormous volume of search warrant applications, leading, in turn, to the administration's decision to seek the new legislation.

More Articles in Washington »

Need to know more? 50% off home delivery of The Times.

**Tips**
To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Past Coverage**
New U.S. Law Credited in Arrests Abroad (September 11, 2007)
Senator Threatens to Charge White House With Contempt (August 21, 2007)
Reported Drop In Surveillance Spurred a Law (August 11, 2007)
In Surveillance Law Fight, A Spy Chief's Education (August 8, 2007)

**Related Searches**
Law and Legislation
Wiretapping and Other Eavesdropping Devices and Methods
Surveillance of Citizens by Government
National Security Agency

---

Also in Opinion:
Will bicycling to work get you killed?
Q&A with Philippe Legrain
Richard Branson writes for Freakonomics

ADVERTISEMENTS

All the news that's fit to personalize. 

 Robert F Kennedy - 1968 Photo
Buy Now

Ads by Google    what's this?
**Find A Business Speaker**
Find Speakers By Name Or Topic. Get Best Selling Authors & Experts
HarperChildrens.com/SpeakersBureau



**INSIDE NYTIMES.COM**

OPINION »

Op-Ed Contributor: Dancing in the Seats

U.S. »

In New Orleans, Rebuilding With Faith

OPINION »

Learning to Like Curt Schilling

In Fair and Foul, Will Leitch on why he's come to like last night's winning pitcher.

ARTS »

Seurat, Drawing His Way to the Grande Jatte

MOVIES »

Joy of Fright: Old Chillers That Should Scare Kids

ESCAPES »

Cleared for Lunching: The $100 Hamburger

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2007 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT F

PRESIDENT | VICE PRESIDENT | FIRST LADY | MRS. CHENEY | NEWS

Your Government | History & Tours | Kids | E-mail | En Español

Podcasts     RSS Feeds

**IN FOCUS**

- Budget Management
- Defense
- Economy
- Education
- Energy
- Environment
- Global Diplomacy
- Gulf Coast
- Health Care
- Homeland Security
- Immigration
- Iraq
- Judicial Nominations
- Medicare
- National Security
- Pandemic Flu
- Patriot Act
- Veterans

more issues

**News**

- Current News
- Press Briefings
- Proclamations
- Executive Orders
- Radio

more news

**News by Date**

- October 2007
- September 2007
- August 2007
- July 2007
- June 2007
- May 2007
- April 2007
- March 2007
- February 2007
- January 2007
- 2006
- 2005
- 2004
- 2003
- 2002
- 2001

**Appointments**

- Nominations
- Applications

**Federal Facts**

- Federal Statistics

**West Wing**

- History

Home > News & Policies > August 2007

Printer-Friendly Version     Email This Page

For Immediate Release
Office of the Press Secretary
August 5, 2007

### President Bush Commends Congress on Passage of Intelligence Legislation

- Fact Sheet: The Protect America Act of 2007
- Fact Sheet: Combating Terrorism Worldwide
- In Focus: National Security

White House News

En Español

When our intelligence professionals have the legal tools to gather information about the intentions of our enemies, America is safer. And when these same legal tools also protect the civil liberties of Americans, then we can have the confidence to know that we can preserve our freedoms while making America safer.

The Protect America Act, passed with bipartisan support in the House and Senate, achieves both of these goals by modernizing the Foreign Intelligence Surveillance Act. Over the past three decades this law has not kept pace with revolutionary changes in technology. As a result, our intelligence professionals have told us that they are missing significant intelligence information that they need to protect the country.

S.1927 reforms FISA by accounting for changes in technology and restoring the statute to its original focus on appropriate protections for the rights of persons in the United States - and not foreign targets located in foreign lands.

Today we face a dynamic threat from enemies who understand how to use modern technology against us. Whether foreign terrorists, hostile nations, or other actors, they change their tactics frequently and seek to exploit the very openness and freedoms we hold dear. Our tools to deter them must also be dynamic and flexible enough to meet the challenges they pose. This law gives our intelligence professionals this greater flexibility while closing a dangerous gap in our intelligence gathering activities that threatened to weaken our defenses.

We know that information we have been able to acquire about foreign threats will help us detect and prevent attacks on our homeland. Mike McConnell, the Director of National Intelligence, has assured me that this bill gives him the most immediate tools he needs to defeat the intentions of our enemies. And so in signing this legislation today I am heartened to know that his critical work will be strengthened and we will be better armed to prevent attacks in the future.

I commend members of Congress who supported these important reforms, and also for acting before adjourning for recess. In particular, I want to thank Mitch McConnell and John Boehner for their strong leadership on this issue, and Senators Kit Bond and Dianne Feinstein for coming together in the Senate on an effective bipartisan solution. In the House of Representatives, Pete Hoekstra and Heather Wilson were instrumental in securing enactment of this vital piece of legislation before the August recess, and I thank them for their leadership.

While I appreciate the leadership it took to pass this bill, we must remember that our work is not done. This bill is a temporary, narrowly focused statute to deal with the most immediate shortcomings in the law.

When Congress returns in September the Intelligence committees and leaders in both

parties will need to complete work on the comprehensive reforms requested by Director McConnell, including the important issue of providing meaningful liability protection to those who are alleged to have assisted our Nation following the attacks of September 11, 2001.

# # #

Printer-Friendly Version    Email This Page

**President** | **Vice President** | **First Lady** | **Mrs. Cheney** | **News & Policies**
**History & Tours** | **Kids** | **Your Government** | **Appointments** | **Jobs** | **Contact** | **Text only**
**Accessibility** | **Search** | **Privacy Policy** | **Help** | **Site Map**

# EXHIBIT G




5 DAY FORECAST

| | |
|---|---|
| **El Paso Times** \| **Inside El Paso** \| **Southwest Parent** | **Jobs** \| **Cars** \| **Classifieds** \| **Real Estate** \| **Apartments** \| **Shopping** |

News | New & Updated | Military | Communities | Business | Opinion | Sports | Entertainment | Living | Obituaries | Español | Customer Service

SEARCH — Site / Web Search powered by YAHOO!

# News

del.icio.us | Digg | Reddit | YahooMyWeb | Google | What's this?

### Transcript: Debate on the foreign intelligence surveillance act
By Chris Roberts / ©El Paso Times
Article Launched: 08/22/2007 01:05:57 AM MDT

The following is the transcript of a question and answer session with National Intelligence Director Mike McConnell.

Question: How much has President Bush or members of his administration formed your response to the FISA debate?

Answer: Not at all. When I came back in, remember my previous assignment was director of the NSA, so this was an area I have known a little bit about. So I came back in. I was nominated the first week of January. I think that happened the 7th of Jan. So as I come in the door and I'm prepping for the hearings, this sort of all happened. So the first thing I want to know is what's this program and what's the background and I was pretty surprised at what I learned. First off, the issue was the technology had changed and we had worked ourselves into a position that we were focusing on foreign terrorist communications, and this was a terrorist foreigner in a foreign country. The issue was international communications are on a wire so all of a sudden we were in a position because of the wording in the law that we had to have a warrant to do that. So the most important thing to capture is that it's a foreigner in a foreign country, required to get a warrant. Now if it were wireless, we would not be required to get a warrant. Plus we were limited in what we were doing to terrorism only and the last time I checked we had a mission called foreign intelligence, which should be construed to mean anything of a foreign intelligence interest, North Korea, China, Russia, Syria, weapons of mass destruction proliferation, military development and it goes on and on and on. So when I engaged with the administration, I said we've gotten ourselves into a position here where we need to clarify, so the FISA issue had been debated and legislation had been passed in the house in 2006, did not pass the Senate. Two bills were introduced in the Senate, I don't know if it was co-sponsorship or two different bills, but Sen. (Dianne Feinstein, D-Calif.) had a bill and Sen. Specter had a bill and it may have been the same bill, I don't know, but the point is a lot of debate, a lot of dialogue. So, it was submitted to the FISA court and the first ruling in the FISA court was what we needed to do we could do with an approval process that was at a summary level and that was OK, we stayed in business and we're doing our mission. Well in the FISA process, you may or may not be aware ...

Advertisement



Q: When you say summary level, do you mean the FISA court?

A: The FISA court. The FISA court ruled presented the program to them and they said the program is what you say it is and it's appropriate and it's legitimate, it's not an issue and was had approval. But the FISA process has a renewal. It comes up every so many days and there are 11 FISA judges. So the second judge looked at the same data and said well wait a minute I interpret the law, which is the FISA law, differently. And it came down to, if it's on a wire and it's foreign in a foreign country, you have to have a warrant and so we found ourselves in a position of actually losing ground because it was the first review was less capability, we got a stay and that took us to the 31st of May. After the 31st of May we were in extremis because now we have significantly less capability. And meantime, the community, before I came back, had been working on a National Intelligence Estimate on terrorist threat to the homeland. And the key elements of the terrorist threat to the homeland, there were four key elements, a resilient determined adversary with senior leadership willing to die for the cause, requiring a place to train and develop, think of it as safe haven, they had discovered that in the border area between Pakistan and Afghanistan. Now the Pakistani government is pushing and pressing and attempting to do something about it, but by and large they have areas of safe haven. So leadership that can adapt, safe haven, intermediate leadership, these are think of them as trainers, facilitators, operational control guys. And the fourth part is recruits. They have them, they've taken them. This area is referred to as the FATA, federally administered tribal areas, they have the recruits and now the objective is to get them into the United States for mass casualties to conduct terrorist operations to achieve mass casualties. All of those four parts have been carried out except the fourth. They have em, but they haven't been successful. One of the major tools for us to keep them out is the FISA program, a significant tool and we're going the wrong direction. So, for me it was extremis to start talking not only to the administration, but to members of the hill. So from June until the bill was passed, I think I talked to probably 260 members, senators and congressmen. We submitted the bill in April, had an open hearing 1 May, we had a closed hearing in May, I don't remember the exact date. Chairman

### More headlines
- Teen pregnancies fall: San Eli logs largest rate drop
- New UT regent linked to El Paso investigation
- EP won't prosecute migrants
- Annual trek will be Sunday on Cristo Rey
- Sleepwalking boy found OK 3 miles from East Side home
- On-air support for SISD bond election is disputed
- 19 EPISD board trustee candidates to meet public
- Officials in Juárez honor braceros with street name
- Water-main break sends Hughey students home
- Pavo Real to drop child care Oct. 30



**Top Jobs**
- Professional BANKING HEAD T
- Healthcare Border Home Care
- General EL PASO COUNTY JUVENI
- Customer Care Taylor Precisio
- Professional ESC Region 19 He

ALL LISTINGS

### Most Viewed Stories
(From the last 12 hours)  RSS

1. Sleepwalking boy found OK 3 miles from East Side home
2. Woman dies after teen falls asleep at wheel
3. New UT regent linked to El Paso investigation
4. Austin mauls Andress
5. EP won't prosecute migrants
6. Water line ruptures; floods neighborhood
7. Teen pregnancies fall: San Eli logs largest rate drop
8. Today's high school football capsules
9. Club 101 owner buys Bar 26

(U.S. Rep. Silvestre Reyes, D-Texas) had two hearings and I had a chance to brief the judiciary committee in the house, the intelligence committee in the house and I just mentioned the Senate, did not brief the full judiciary committee in the Senate, but I did meet with Sen. (Patrick Leahy, D-Vt.) and Sen. (Arlen Specter, R-Pa.), and I did have an opportunity on the Senate side, they have a tradition there of every quarter they invite the director of national intelligence in to talk to them update them on topics of interest. And that happened in (June 27). Well what they wanted to hear about was Iraq and Afghanistan and for whatever reason, I'm giving them my review and they ask questions in the order in which they arrive in the room. The second question was on FISA, so it gave me an opportunity to, here I am worrying about this problem and I have 41 senators and I said several things. The current threat is increasing, I'm worried about it. Our capability is decreasing and let me explain the problem.

Q: Can't you get the warrant after the fact?

A: The issue is volume and time. Think about foreign intelligence. What it presented me with an opportunity is to make the case for something current, but what I was really also trying to put a strong emphasis on is the need to do foreign intelligence in any context. My argument was that the intelligence community should not be restricted when we are conducting foreign surveillance against a foreigner in a foreign country, just by dint of the fact that it happened to touch a wire. We haven't done that in wireless for years.

Q: So you end up with people tied up doing paperwork?

A: It takes about 200 man hours to do one telephone number. Think about it from the judges standpoint. Well, is this foreign intelligence? Well how do you know it's foreign intelligence? Well what does Abdul calling Mohammed mean, and how do I interpret that? So, it's a very complex process, so now, I've got people speaking Urdu and Farsi and, you know, whatever, Arabic, pull them off the line have them go through this process to justify what it is they know and why and so on. And now you've got to write it all up and it goes through the signature process, take it through (the Justice Department), and take it down to the FISA court. So all that process is about 200 man hours for one number. We're going backwards, we couldn't keep up. So the issue was ...

Q: How many calls? Thousands?

A: Don't want to go there. Just think, lots. Too many. Now the second part of the issue was under the president's program, the terrorist surveillance program, the private sector had assisted us. Because if you're going to get access you've got to have a partner and they were being sued. Now if you play out the suits at the value they're claimed, it would bankrupt these companies. So my position was we have to provide liability protection to these private sector entities. So that was part of the request. So we went through that and we argued it. Some wanted to limit us to terrorism. My argument was, wait a minute, why would I want to limit it to terrorism. It may be that terrorists are achieving weapons of mass destruction, the only way I would know that is if I'm doing foreign intelligence by who might be providing a weapon of mass destruction.

Q: And this is still all foreign to foreign communication?

A: All foreign to foreign. So, in the final analysis, I was after three points, no warrant for a foreigner overseas, a foreign intelligence target located overseas, liability protection for the private sector and the third point was we must be required to have a warrant for surveillance against a U.S. person. And when I say U.S. person I want to make sure you capture what that means. That does not mean citizen. That means a foreigner, who is here, we still have to have a warrant because he's here. My view is that that's the right check and balances and it's the right protection for the country and lets us still do our mission for protection of the country. And we're trying to fend off foreign threats.

Q: So are you satisfied with it the way it is now?

A: I am. The issue that we did not address, which has to be addressed is the liability protection for the private sector now is proscriptive, meaning going forward. We've got a retroactive problem. When I went through and briefed the various senators and congressmen, the issue was alright, look, we don't want to work that right now, it's too hard because we want to find out about some issues of the past. So what I recommended to the administration is, 'Let's take that off the table for now and take it up when Congress reconvenes in September.'

Q: With an eye toward the six-month review?

A: No, the retroactive liability protection has got to be addressed.

Q: And that's not in the current law?

A: It is not. Now people have said that I negotiated in bad faith, or I did not keep my word or whatever...

Q: That you had an agenda that you weren't honest about.

A: I'll give you the facts from my point of view. When I checked on board I had my discussion with the president. I'm an apolitical figure. I'm not a Republican, I'm not a Democrat. I have voted for both. My job is as a professional to try to do this job the best way I can in terms of, from the intelligence community, protect the nation. So I made my argument that we should have the ability to do surveillance the same way we've done it for the past 50 years and not be inhibited when it's a foreigner in a foreign country. The president's guidance to me early in the process, was, 'You've got the experience. I trust your judgement. You make the right call. There's no pressure from anybody here to tell you how to do it. He did that early. He revisited with me in June. He did it again in July and he said it publicly on Friday before the bill was passed. We were at the FBI, it's an annual thing, we go to the FBI and do a homeland security kind of update. So he came out at noon and said, 'I'm requesting that Congress pass this bill. It's essential. Do it before you go on recess. I'm depending on Mike McConnell's recommendations. And that was the total sum and substance of the guidance and the involvement from the White House with regard to how I should make the call. Now, as we negotiated, we started with 66 pages, were trying to get everything cleaned up at once. When I reduced it to my three points, we went from 66 pages to 11. Now, this is a very, very complex bill. I had a team of 20 lawyers working. You can change a word in a paragraph and end up with some major catastrophe down in paragraph 27, subsection 2c, to shut yourself down, you'll be out of business. So when we send up our 11 pages, we had a lot of help in making sure we got it just right so it would come back and we'd say wait a minute we can't live with this or one of the lawyers would say, 'Wait we tried that, it won't work, here's the problem.' So we kept going back and forth, so we sent up a version like Monday, we sent up a version on Wednesday, we sent up a version on Thursday. The House leadership, or the Democratic leadership on Thursday took that bill and we talked about it. And my response was there are some things I can't live with in this bill and they said alright we're going to fix them. Now, here's the issue. I never then had a chance to read it for the fix because, again, it's so complex, if you change a word or phrase, or even a paragraph reference, you can cause unintended ...

Q: You have to make sure it's all consistent?

A: Right. So I can't agree to it until it's in writing and my 20 lawyers, who have been doing this for two years, can work through it. So in the final analysis, I was put in the position of making a call on something I hadn't read. So when it came down to crunch time, we got a copy and it had some of the offending language back in it. So I said, 'I can't support it.' And it played out in the House the way it played out in the House. Meantime on the Senate side, there were two versions being looked at. The Wednesday version and the Thursday version. And one side took one version and the other side took the other version. The Thursday version, we had some help, and I didn't get a chance to review it. So now, it's Friday night, the Senate's voting. They were having their debate and I still had not had a chance to review it. So, I walked over, I was up visiting some senators trying to explain some of the background. So I walked over to the chamber and as I walked into the office just off the chamber, it's the vice president's office, somebody gave me a copy. So I looked at the version and said, 'Can't do it. The same language was back in there.'

Q: What was it?

A: Just let me leave it, not too much detail, there were things with regard to our authorities some language around minimization. So it put us in an untenable position. So then I had another version to take a look at, which was our Wednesday version, which basically was unchanged. So I said, well certainly, I'm going to support that Wednesday version. So that's what I said and the vote happened in the Senate and that was on Friday. So now

10. Girl, 14, hasn't been seen since Sept. 18

it rolled to the House on Saturday. They took up the bill, they had a spirited debate, my name was invoked several times, not in a favorable light in some cases. (laughs) And they took a vote and it passed 226 to 182, I think. So it's law. The president signed it on Sunday and here we are.

Q: That's far from unanimous. There's obviously going to be more debate on this.

A: There are a couple of issues to just be sensitive to. There's a claim of reverse targeting. Now what that means is we would target somebody in a foreign country who is calling into the United States and our intent is to not go after the bad guy, but to listen to somebody in the United States. That's not legal, it's, it would be a breach of the Fourth Amendment. You can go to jail for that sort of thing. And If a foreign bad guy is calling into the United States, if there's a need to have a warrant, for the person in the United States, you just get a warrant. And so if a terrorist calls in and it's another terrorist, I think the American public would want us to do surveillance of that U.S. person in this case. So we would just get a warrant and do it. It's a manageable thing. On the U.S. persons side it's 100 or less. And then the foreign side, it's in the thousands. Now there's a sense that we're doing massive data mining. In fact, what we're doing is surgical. A telephone number is surgical. So, if you know what number, you can select it out. So that's, we've got a lot of territory to make up with people believing that we're doing things we're not doing.

Q: Even if it's perception, how do you deal with that? You have to do public relations, I assume.

A: Well, one of the things you do is you talk to reporters. And you give them the facts the best you can. Now part of this is a classified world. The fact we're doing it this way means that some Americans are going to die, because we do this mission unknown to the bad guys because they're using a process that we can exploit and the more we talk about it, the more they will go with an alternative means and when they go to an alternative means, remember what I said, a significant portion of what we do, this is not just threats against the United States, this is war in Afghanistan and Iraq.

Q. So you're saying that the reporting and the debate in Congress means that some Americans are going to die?

A. That's what I mean. Because we have made it so public. We used to do these things very differently, but for whatever reason, you know, it's a democratic process and sunshine's a good thing. We need to have the debate. The reason that the FISA law was passed in 1978 was an arrangement was worked out between the Congress and the administration, we did not want to allow this community to conduct surveillance, electronic surveillance, of Americans for foreign intelligence unless you had a warrant, so that was required. So there was no warrant required for a foreign target in a foreign land. And so we are trying to get back to what was the intention of '78. Now because of the claim, counterclaim, mistrust, suspicion, the only way you could make any progress was to have this debate in an open way.

Q. So you don't think there was an alternative way to do this?

A. There may have been an alternative way, but we are where are ...

Q. A better way, I should say.

A. All of my briefs initially were very classified. But it became apparent that we were not going to be able to carry the day if we don't talk to more people.

Q. Some might say that's the price you pay for living in a free society. Do you think that this is necessary that these Americans die?

A. We could have gotten there a different way. We conducted intelligence since World War II and we've maintained a sensitivity as far as sources and methods. It's basically a sources and methods argument. If you don't protect sources and methods then those you target will choose alternative means, different paths. As it is today al-Qaida in Iraq is targeting Americans, specifically the coalition. There are activities supported by other nations to import electronic, or explosively formed projectiles, to do these roadside attacks and what we know about that is often out of very sensitive sources and methods. So the more public it is, then they take it away from us. So that's the tradeoff.

DIVERSITY IN THE INTELLIGENCE COMMUNITY

Q: I wanted to ask you about the diversity question. This has major ramifications here, we have this center of excellence program that's recruiting high school kids, many of whom wouldn't qualify if first generation American citizens weren't allowed.

A: So you agree with me?

Q: It does sound like something that would benefit this area that would also allow you to get people from here who are bicultural and have an openness to seeing things ...

A: You're talking about Hispanics?

Q: Yes.

A: Hispanics are probably the most under-represented group if you think of America, what the ethic makeup of America, Hispanics are the most under-represented group in my community. Now, that said, and should increase that Hispanic population and programs like this will do that. That's why the outreach. But also we need, particularly with the current problem of terrorism, we need to have speakers of Urdu and Farsi and Arabic and people from those cultures that understand the issues of tribes and clans and all the things that go with understanding that part of the world. Varying religions and so on. Because it is, it's almost impossible, I've had the chance to live in the Middle East for years, I've studied it for years, it's impossible to understand it without having some feel for the culture and so on. So while I'm all for increasing the diversity along the lines we talked about, I'm also very much in favor of first generation Americans from the countries that are causing issues and problems.

Q: What is the status of that program.

A: It is not in statue. It is not in policy. It has been habit. So we've stated, as a matter of policy, that we're not going to abide by those habits.

Q: And that's already the case?

A: Yes, and are we making progress? Not fast enough, but we will make progress over time.

Q: How do you measure that?

A: Very simple, you get to measure what are you and where are you trying go and are you making progress. I wrestled with this years ago when I was NSA ....

Q: You don't want quotas, though?

A: Quotas are forbidden so we set goals. My way of thinking about it is what is your end state? Now some would say that federal governments should look like America, whatever that is. OK, that sounded like a reasonable metric, so I said, 'Alright, what does America look like?' So I got a bunch of numbers. I said, 'Alright, what do we look like?' and it didn't match, and as I just told you, the one place where there's the greatest mismatch is Hispanic. It's much closer, as matter of fact, people would be surprised how close it is across, at least my community among the other minorities. Now, that said, numbers don't necessarily equal positioning in the organization. So that's another feature we have to work on, is placement of women and minorities in leadership positions.

Q: So, you're quantifying that as well?

A: Yes.

TERRORIST ACTIVITY ON THE NATION'S SOUTHWEST BORDER

Q: There seems to be very little terrorist-related activity on the Southwest border, which is watched very closely because of the illegal immigration issue. Can you talk about why it's important to be alert here?

A: Let me go back to my NIE, those are unclassified key judgements, pull them down and look at them. You've got committed leadership. You've got a place to train. They've got trainers and they've got recruits. The key now is getting recruits in. So if the key is getting recruits in. So, if you're key is getting recruits in, how would you do that? And so, how would you do that?

Q: I'd go to the northern border where there's nobody watching.

A: And that's a path. Flying in is a path. Taking a ship in is a path. Coming up through the Mexican border is a path. Now are they doing it in great numbers, no. Because we're finding them and we're identifying them and we've got watch lists and we're keeping them at bay. There are numerous situations where people are alive today because we caught them (terrorists). And my point earlier, we catch them or we prevent them because we've got the sources and methods that lets us identify them and do something about it. And you know the more sources and methods are compromised, we have that problem.

Q: And in many cases we don't hear about them?

A: The vast majority you don't hear about. Remember, let me give you a way to think about this. If you've got an issue, you have three potential outcomes, only three. A diplomatic success, an operational success or an intelligence failure. Because all those diplomatic successes and operations successes where there's intelligence contribution, it's not an intelligence success. It's just part of the process. But if there's an intelligence failure ...

Q: Then you hear about it.

A: So, are terrorists coming across the Southwest border? Not in great numbers.

Q: There are some cases?

A: There are some. And would they use it as a path, given it was available to them? In time they will.

Q: If they're successful at it, then they'll probably repeat it.

A: Sure. There were a significant number of Iraqis who came across last year. Smuggled across illegally.

Q: Where was that?

A: Across the Southwest border.

Q: Can you give me anymore detail?

A: I probably could if I had my notebook. It's significant numbers. I'll have somebody get it for you. I don't remember what it is. The point is it went from a number to (triple) in a single year, because they figured it out. Now some we caught, some we didn't. The ones that get in, what are they going to do? They're going to write home. So, it's not rocket science, word will move around. There's a program now in South America, where you can, once you're in South American countries, you can move around in South America and Central America without a visa. So you get a forged passport in Lebanon or where ever that gets you to South America. Now, no visa, you can move around, and with you're forged passport, as a citizen of whatever, you could come across that border. So, what I'm highlighting is that something ...

Q: Is this how it happened, the cases you're talking about?

A: Yes.

 Print    Email    Return to Top

**New and Updated**
Marty Martin play begins at 7 p.m. at Plaza
Blog: YouTube bridges generation gap
Senate approves continuing Internet tax moratorium
Upper Rio Grande @ Work opens Lower Valley office

**Nation / World**
Extradition denied in assisted suicide
Afghan leader: Cut back on airstrikes
Court allows anti-harass training suit
Ex-Gov. Ryan ordered to prison by Nov. 7

| **Refinance and Save $1,000S** $150,000 Mortgage for $483/month. Compare up to 4 free www.pickamortgage.com | **Refinance $300,000 for Only $965/Month** $300,000 Mortgage for only $965/month. Save $1,000's - No www.HomeLoanHelpLine.com | **House Payments Fall Again** See Rates, No Credit Check Req. Calculate Your New Mortgage www.LowerMyBills.com |
|---|---|---|

Copyright © 2007 by the El Paso Times and MediaNews Group and/or wire services and suppliers.
None of the content on this site may be republished or reused in any way without the written permission of the copyright holder.

      Visit other Real City Sites

News Partners: Alamogordo Daily News · Carlsbad Current-Argus · The Deming Headlight · Farmington Daily Times · Las Cruces Sun-News · Ruidoso News · Silver City Sun-News

El Paso Times Site Map

Privacy Policy  |  MNG Corporate Site Map  |  Copyright

# EXHIBIT H

# Newsweek

## Case Dismissed?
**The secret lobbying campaign your phone company doesn't want you to know about**

Sponsored By 

**By Mark Hosenball**
NEWSWEEK WEB EXCLUSIVE
Updated: 3:23 PM ET Sep 26, 2007

The nation's biggest telecommunications companies, working closely with the White House, have mounted a secretive lobbying campaign to get Congress to quickly approve a measure wiping out all private lawsuits against them for assisting the U.S. intelligence community's warrantless surveillance programs.

The campaign—which involves some of Washington's most prominent lobbying and law firms—has taken on new urgency in recent weeks because of fears that a U.S. appellate court in San Francisco is poised to rule that the lawsuits should be allowed to proceed.

If that happens, the telecom companies say, they may be forced to terminate their cooperation with the U.S. intelligence community—or risk potentially crippling damage awards for allegedly turning over personal information about their customers to the government without a judicial warrant.

"It's not an exaggeration to say the U.S. intelligence community is in a near-panic about this," said one communications industry lawyer familiar with the debate who asked not to be publicly identified because of the sensitivity surrounding the issue.

But critics say the language proposed by the White House—drafted in close cooperation with the industry officials—is so extraordinarily broad that it would provide retroactive immunity for all past telecom actions related to the surveillance program. Its practical effect, they argue, would be to shut down any independent judicial or state inquires into how the companies have assisted the government in eavesdropping on the telephone calls and e-mails of U.S. residents in the aftermath of the September 11 terror attacks.

"It's clear the goal is to kill our case," said Cindy Cohn, legal director of the Electronic Frontier Foundation, a San Francisco-based privacy group that filed the main lawsuit against the telecoms after The New York Times first disclosed, in December 2005, that President Bush had approved a secret program to monitor the phone conversations of U.S. residents without first seeking judicial warrants. The White House subsequently confirmed that it had authorized the National Security Agency to conduct what it called a "terrorist surveillance program" aimed at communications between suspected terrorists overseas and individuals inside the United States. But the administration has also intervened, unsuccessfully so far, to try to block the lawsuit from proceeding and has consistently refused to discuss any details about the extent of the program—rebuffing repeated congressional requests for key legal memos about it.

"They are trying to completely immunize this [the surveillance program] from any kind of judicial review," added Cohn. "I find it a little shocking that Congress would participate in the covering up of what has been going on."

But congressional staffers said this week that some version of the proposal is likely to pass—in part because of a high-pressure lobbying campaign warning of dire consequences if the lawsuits proceed. Director of National Intelligence Mike McConnell seemed to raise the stakes recently when he contended in an interview with the El Paso Times that the private lawsuits could "bankrupt these companies."

Among those coordinating the industry's effort are two well-connected capital players who

both worked for President George H.W. Bush: Verizon general counsel William Barr, who served as attorney general under 41, and AT&T senior executive vice president James Cicconi, who was the elder Bush's deputy chief of staff.

Working with them are a battery of major D.C. lobbyists and lawyers who are providing "strategic advice" to the companies on the issue, according to sources familiar with the campaign who asked not to be identified talking about it. Among the players, these sources said: powerhouse Republican lobbyists Charlie Black and Wayne Berman (who represent AT&T and Verizon, respectively), former GOP senator and U.S. ambassador to Germany Dan Coats (a lawyer at King & Spaulding who is representing Sprint), former Democratic Party strategist and one-time assistant secretary of State Tom Donilon (who represents Verizon), former deputy attorney general Jamie Gorelick (whose law firm also represents Verizon) and Brad Berenson, a former assistant White House counsel under President George W. Bush who now represents AT&T.

Because of the extreme secrecy surrounding the warrantless surveillance program, few if any of the lobbyists and lawyers are prepared to speak publicly about their role. "My client requires me not to talk to the press," said the normally loquacious Black when asked by NEWSWEEK about his lobbying for AT&T. Berman and Berenson also declined comment. Gorelick confirmed that she is providing "strategic advice," not lobbying for Verizon. Coats and Donilon did not respond to requests for comment.

But according to three industry sources, these and other players have been conferring with each other over legislative strategy and targeting key lawmakers and staffers, especially those on the House and Senate Intelligence and Judiciary Committees. The lobbyists have set up meetings and arranged conference calls, pressing the argument that failure to provide protection to the companies could interfere with the vital assistance they say the telecom industry has provided the intelligence community in monitoring the communications of Al Qaeda and other terrorist operations overseas.

The case for new legislation retroactively giving telecoms companies protection against private lawsuits—including lawsuits already pending—was outlined this week by Kenneth Wainstein, assistant attorney general for national security. At a House Judiciary Committee hearing chaired by Rep. John Conyers, a Michigan Democrat, Wainstein said that giving telecoms companies retroactive liability was a matter of "general fairness."

"I think it's sort of fundamentally unfair and just not right to—if a company allegedly assisted the government in its national-security efforts, in an effort to defend the country at a time of peril, that they then get turned around and face tremendously costly litigation and maybe even crushing liability for having helped the United States government at a time of need ... it's just not right," Wainstein testified.

Wainstein also claimed that "every time we have one of these lawsuits, very sensitive information gets discussed and gets leaked out, disseminated out in the public. And our adversaries are smart, both the terrorists who might be over in, you know, someplace in the Middle East are smart, and then the governments that might be our adversaries are tremendously sophisticated, and they're gleaning all this information that gets out." Wainstein also said that a telecom company's overseas assets could be threatened if its collaboration in U.S. espionage efforts were confirmed in a court case.

The campaign for industry protection was initially launched last summer when administration and industry officials first tried to get the immunity provision included in the Protect America Act—a measure passed by Congress and signed by President Bush on Aug. 5 that allowed the surveillance program to continue and temporarily gave the National Security Agency expanded eavesdropping powers. At the time, Democrats in Congress balked at including the kind of sweeping retroactive civil immunity protections that the industry sought.

But then, on Aug. 15, a three-judge panel of the Ninth Circuit Court of Appeals in San Francisco heard oral arguments in a Justice Department motion to block the Electronic Frontier Foundation lawsuit against AT&T. More than 40 other civil suits filed against the telecoms—many of them seeking billions of dollars in damages—had been consolidated with the EFF lawsuit. But the Justice Department had sought to block the lawsuits under the "state privilege" doctrine, which can require the dismissal of suits that might endanger national security.

The three-judge panel, made up entirely of Democratic appointees, seemed openly skeptical of the Justice Department's arguments, prompting many court observers to conclude that the

panel was likely to issue a ruling permitting the lawsuits to proceed. At one point in the proceedings, one of the judges, Harry Pregerson, a Jimmy Carter appointee, appeared annoyed with the Justice Department lawyer, Gregory Garre. The judge wanted Garre to provide direct answers to questions about the scope of the just-passed surveillance law, according to press reports. When Garre tried to explain that the law was complicated, Pregerson shot back: "Can't be any more complicated than my phone bill."

The administration is keeping up pressure on Congress for quick action on the new version of the surveillance law—including an immunity provision for telecoms—which will take effect when the Protect America Act expires early next year. Congressional staffers say that Democrats are likely to go along with some version of the proposal. But Democratic leaders, who say they were stampeded into passing the law last summer, are insisting on having more thorough hearings and forcing the administration to turn over documents on the surveillance program. If the telecoms want immunity, some Democrats say, the White House should at least say what it is they need immunity for.

URL: http://www.newsweek.com/id/41142

© 2007 Newsweek.com